# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| MANUEL TARANGO, JR., )<br>  )<br>Petitioner, )<br>  )<br>vs. )<br>  )<br>E.K. MCDANIEL et al., )<br>  )<br>Respondents. )<br>  ) | 3:10-cv-00146-RCJ-VPC<br><br>**ORDER** |

Petitioner Manual Tarango, Jr., a prisoner in state custody, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the reasons given herein, the Court denies the Petition.

## I.     FACTS AND PROCEDURAL HISTORY

A Judgment of Conviction was entered against Petitioner on February 8, 2006 following a jury trial, wherein he was convicted of burglary with the use of a deadly weapon, attempted robbery with the use of a deadly weapon, conspiracy to commit robbery with the use of a deadly weapon, three counts of battery with the use of a deadly weapon, and attempted murder with the use of a deadly weapon. *See* Pet'r's Ex. 48.[1]  Petitioner's sentence includes various terms of imprisonment totaling a minimum of 22 years and a maximum of 58 years. *See* Pet'r's Ex. 44.

The event giving rise to the charges was a robbery wherein Petitioner and two co-

---

[1] The exhibits referred to in this Order were submitted by Petitioner in support of his First Amended Petition and are found in the electronic docket at ECF Nos. 18–20.

conspirators entered a bar filled with off-duty police officers and committed armed robbery, resulting in the death of one of the co-conspirators and the wounding of several other people, including one of the police officers. Petitioner and the surviving co-conspirator escaped. Petitioner was later arrested, and he was the only co-conspirator brought to trial. Petitioner defended based upon mistaken identity. *See* Pet'r's Ex., pp. 2–10. His lengthy trial was attended daily by numerous Las Vegas Metropolitan Police Department ("Metro") officers. *See* Pet'r's Ex. 77.

At the completion of the evidence, the jury began its deliberations, which continued over the next two days. After an initial five hours of deliberation, the jury sent notes to the judge posing various questions. *See* Pet'r's Ex. 23. A note regarding a stalemate the jury had reached because a of "problem juror" who had doubts "beyond the limit of reasonable doubt" soon followed. Pet'r's Exs. 23, 25, 27. The trial court directed the jury to continue its deliberations. *See* Pet'r's Ex. 23, p. 12. Ultimately the jury reached a verdict of guilty. *See* Pet'r's Ex. 30. Two days later, Juror 2, the juror with the "problem," wrote a letter to the trial court in which he had changed his vote to "guilty" as a result of having been followed to the courthouse on the second full day of deliberations by a Metro squad car, which caused him to "conclude Metro somehow knew who [he] was and knew of [his] unwillingness to convict." Pet'r's Ex. 31. He claimed he had "relinquished [his] vote under duress." *Id*. The juror also sent a copy to Petitioner's defense counsel, who filed a motion to overturn the verdict and for a new trial. *See* Pet'r's Ex. 33.

After an evidentiary hearing wherein Petitioner's counsel, a deputy district attorney, the lead police detective, and Juror 2 testified, the trial court denied the motion.[2] *See* Pet'r's Ex. 40, p. 41. The trial court permitted testimony concerning the object fact of whether Juror 2 had been

---

[2] Petitioner's trial counsel, Attorney Saggese, was disqualified from representing petitioner in the evidentiary proceedings because of his status as a witness. While the three other witnesses were questioned by counsel, the trial judge posed all questions to the juror in order to closely control what evidence was elicited.

contacted by Metro and found that Petitioner had not made any such showing; however, the trial court excluded the proffered testimony of Juror 2's subjective state of mind as to whether he had voted to convict not based upon the law and the evidence but only because he perceived a threat. Thereafter, Juror 2 wrote a second letter to the trial court which became the basis for a motion to reconsider, *see* Pet'r's Ex. 41, p. 7, which the trial court also denied, *see* Pet'r's Ex. 47.

The trial court entered Judgment on February 8, 2006. *See* Pet'r's Ex. 48. Petitioner appealed. *See* Pet'r's Ex. 52. The appeal rested on a single claim that Petitioner was entitled to a new trial because there had been "misconduct whether real or perceived which coerced a juror into changing his verdict, not based on the evidence at trial." *Id.*, p. 12. The Nevada Supreme Court affirmed on September 25, 2007, *see* Pet'r's Ex. 56, and issued the remittitur on December 3, 2007, *see* Pet'r's Ex. 59.

Petitioner filed a state post-conviction petition in October 2008 *in pro se*, raising five claims of ineffective assistance of trial counsel—in Nevada, ineffective assistance of counsel claims may not be brought on direct appeal, but only in post-conviction proceedings—one ground of ineffective assistance of appellate counsel, and a claim of cumulative error. *See* Pet'r's Ex. 63. No counsel was appointed nor any evidentiary hearing conducted. However, following an *ex parte* hearing involving only the state, and after entertaining arguments only from the state, the trial court denied the post-conviction petition. *See* Pet'r's Ex. 69. The Findings of Fact, Conclusions of Law, and Order were entered, and Petitioner appealed. *See* Pet'r's Exs. 70,72. The Nevada Supreme Court affirmed on February 4, 2010. *See* Pet'r's Ex. 73.

Petitioner submitted his Petition to this Court on March 15, 2010, and the Federal Public Defender was appointed to represent him. (*See* ECF Nos. 1, 9). Petitioner filed the First Amended Petition ("FAP") on January 3, 2011, (*see* ECF No. 17), and Respondents moved to dismiss it, arguing it contained an unexhausted claim, (*see* ECF No. 22). The Court granted the motion in part, and Petitioner abandoned the unexhausted claim. (*See* ECF No. 25). The Answer

and Reply to the FAP are now before the Court.

## II. DISCUSSION

### A. Legal Standards

Section 2254(d) of Title 28, a provision of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), provides the legal standards for a federal court's consideration of a petition for habeas corpus by a prisoner in state custody:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). These standards of review "reflect the . . . general requirement that federal courts not disturb state court determinations unless the state court has failed to follow the law as explicated by the Supreme Court." *Davis v. Kramer*, 167 F.3d 494, 500 (9th Cir. 1999). This Court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). "[A] state court decision is 'contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'" *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). A state court decision is an unreasonable application of clearly established Supreme Court precedent, "if the state court identifies the correct governing legal principle from our decisions but unreasonably applies that principle to the facts of the prisoner's

case." *Id.* at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" standard requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

In determining whether a state court decision is contrary to federal law, a federal court looks to the last reasoned decision in the state courts. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803—04 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000), *cert. denied*, 534 U.S. 944 (2001). Furthermore, "a determination of a factual issue made by a State court shall be presumed to be correct," and a petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

**B. Merits**

**1. Ground One - Juror Misconduct/Jury Tampering**

Ground One states:

> Tarango was convicted because one of the jurors believed that the State was trying to intimidate him, and not because he believed Tarango was guilty. As such, Tarango is incarcerated in violation of his right to a Fair Trial, an Impartial Jury, and Due Process under the 6th and 14th Amendments of the United States Constitution.

FAP 7. The Court finds that the claim is meritorious. The state trial court denied the motion for a new trial and the subsequent motion to reconsider after finding that there had been no contact with Juror 2 and refusing to admit Petitioner's proffered evidence concerning the effect of the perceived contact upon his vote to convict. The state court refused to admit this evidence because it interpreted section 50.065(2) of the Nevada Revised Statutes to prohibit the admission of any evidence bearing upon a juror's mental processes in challenging a verdict, and the state rule included mental pressures brought to bear via external jury tampering:

> 2. Upon an inquiry into the validity of a verdict or indictment:
>
> (a) A juror shall not testify concerning the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent

> to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.
>
> (b) The affidavit or evidence of any statement by a juror indicating an effect of this kind is inadmissible for any purpose.

Nev. Rev. Stat. § 50.065(2). The Nevada Supreme Court affirmed, noting that Juror 2's perception of a threat to him was "speculative." The analogous federal rule, however, permits several exceptions, including that "an outside influence was improperly brought to bear on any juror." Fed. R. Evid. 606(b)(2)(B).

The Court finds that the state trial court did not unreasonably apply clearly established federal law in refusing to consider the proffered evidence of Juror 2's perception of jury tampering. First, the Court must accept the state courts' interpretation of the state rule. Second, no conflict between the federal and state evidentiary rules is at issue here. Federal rules of evidence of course apply in federal court notwithstanding any conflicting state rule, but federal evidence rules do not apply to preempt state rules in state court, and therefore Petitioner cannot maintain an argument that the state court's refusal to adhere to the federal rule was an error of federal law. Rather, the clearly established federal law relevant to the present case provides:

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*United States v. Angulo*, 4 F.3d 843, 846 (9th Cir. 1993) (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)). Where there is an indication that a juror may have been improperly influenced, a hearing is required to determine prejudice. *See Dennis v. United States*, 339 U.S. 162, 171–72 (1950) ("Preservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury."). And a state court cannot limit the effect of a federal constitutional rule via a state evidentiary rule. *Cf. Sears v. Upton*, 130 S. Ct. 3259, 3263 & n.6

(2010) (noting that the Eighth and Fourteenth Amendments mandate the opportunity to adduce all evidence relevant to mitigation at the sentencing-phase of a death-penalty case, notwithstanding its usual inadmissibility under a state hearsay rule).  The same principal applies here: a state court cannot exclude reliable evidence relevant to a *Remmer* inquiry based upon a state evidentiary rule.

Under *Remmer*, the Government has the burden to show harmlessness if there is an actual improper contact.  But a petitioner must make the initial threshold showing of an improper contact by a preponderance of the evidence, and the state court found that Petitioner failed to make this showing.  The Courts of Appeals generally hold that only juror fears created by actual external influence, and not subjective fears whose source is the juror's own mind, can be the basis of the impeachment of a juror's verdict. *See United States v. Krall*, 835 F.2d 711, 715–16 (8th Cir. 1987) (rejecting the argument that jurors' subjective fears of IRS retaliation constituted external influence); *Gov't of V.I. v. Gereau*, 523 F.2d 140 (3d Cir. 1975) (listing publicity, extra-record evidence reaching the jury room, and communication or contacts between jurors and litigants, the court, or other third parties as situations constituting improper external influence). The Court is tempted to say that the fact Juror 2 rendered his verdict based not upon the law and evidence, but because of his perception of a threat, is dispositive.  After all, the right to a fair and impartial jury would appear to be violated in such a circumstance regardless of whether the juror is correct about having been threatened.  A true external threat cannot be said to impugn the integrity of a verdict any more than a wrongly, but actually, perceived external threat.  On the other hand, it simply cannot be avoided that the Courts of Appeals have rejected this approach by holding consistently that jurors cannot impeach their verdicts based upon subjective fears uncorroborated by objective evidence of external influence.  There is certainly no clear Supreme Court precedent to the contrary, which is dispositive of the issue in the context of § 2254(d)(1).  If anything, Supreme Court case law is clear that objective proof of external contact is required.

The rule requiring objective corroboration of external influence represents a balancing of the defendant's right to a fair trial against the State's and the People's interest in the finality of verdicts and jurors' interests in peace from disgruntled litigants. *See Tanner v. United States*, 483 U.S. 107, 116–21 (1987). A juror will simply not be heard to impeach his own verdict unless he can provide objectively verifiable evidence of improper influence, in which case there is a presumption of prejudice. The Court therefore finds that once the state trial court ruled that Petitioner had failed to show an objective external contact by Metro, it was within constitutional bounds to apply the state evidentiary rule to exclude any evidence of Juror 2's subjective perception of fear, even though the alleged fear in this case was, to be sure, less speculative than in the cases cited, *supra*.

The remaining question is whether the state trial court's determination of a lack of contact by Metro was unreasonable in light of the evidence before it. In making this determination, the Court must only grant habeas corpus relief if the state court's determination of fact was "clearly erroneous" as that term is used in the context of the Court of Appeals's review of factual determinations made by district courts, *Torres v. Prunty*, 223 F.2d 1103, 1107–08 (9th Cir. 2000), i.e., "only if [the Court is] left with a firm conviction that the determination made by the state court was wrong and that the one [Petitioner] urges was correct.," *id.* at 1108 (citing *Van Tran v. Lindsey*, 212 F.3d 1143, 1153–54 (9th Cir. 2000) (internal quotations marks omitted)). The result cannot be "merely debatable. . . . These stringent standards 'guard against extreme malfunctions in the state criminal justice systems, not as a substitute for ordinary error correction through appeal.'" *Griffin v. Harrington*, --- F.3d. ----, 2013 WL 4267105, at *4 (9th Cir. 2013) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)) (citation omitted).

The hearing on the motion for new trial was held on December 19, 2005. (*See* Hr'g Tr., Dec. 19, 2005, ECF No. 19-15). Trial counsel, Mr. Saggese, first testified that there had been a note from the jury foreperson that there was a juror refusing to participate in deliberations and a

second note from that juror himself, which the Court did not permit to be testified to under state law prohibiting the consideration of any evidence concerning a juror's state of mind. (*See id.* 7–20). Saggese testified, however, that the note had been read in court and discussed, and that after the hearing, he overheard Assistant District Attorney DiGiacomo speaking on the telephone to Detective Vicarro, and that DiGiacomo mentioned near the end of the conversation that there was a holdout juror. (*See id.* 20–23). Sagesse heard DiGiacomo identify Juror 2 to Vicarro by number, but not by name. (*See id.* 24–25). Counsel and the court then discussed the communications from Juror 2 to the court and counsel concerning his perception of harassment by Metro. Eventually, Juror 2 himself testified. He testified that on the second day of jury deliberations, he had just entered Interstate 15 at Tropicana Avenue from his place of work in Henderson on his way to the courthouse in downtown Las Vegas when he noticed a Metro squad car so close behind him that he couldn't see the front wheels or bumper. (*See id.* 130–33). The court takes judicial notice of the facts that: (1) it is approximately 15 miles by road from central Henderson to the I-15 on-ramp at Tropicana Ave in Las Vegas, Nevada; and (2) it is approximately six more miles by road to the Regional Justice Center in downtown Las Vegas. The Metro car remained very close to him all the way to the parking garage in downtown Las Vegas, where it finally left. (*See id.* 133–37). He could only identify the car as a black-and-white police car. He could not identify any markings on the car or whether the driver was male or female. (*Id.* at 137). Juror 2 was driving the same car as he had driven to the trial the previous day and confirmed he had been followed so closely the entire way that he could not see the car's bumper. (*Id.* 146–47). After argumentation, the court noted that it was inclined to deny the motion because the evidence was ambiguous, vague, and non-specific. (*Id.* 159).

   The Court cannot say it is firmly convinced the state court made an erroneous determination of fact as to whether Juror 2 had been improperly contacted. Although the state court's ruling is debatable, it was not clearly erroneous. There is room for the state court's

opinion that Juror 2's perception that his experience driving to trial was related to his service as a juror was speculative.  Petitioner was unable, via the testimony of Juror 2 or otherwise, to identify the officer (or vehicle) who allegedly attempted to harass Juror 2.  There is a heavy patrol car presence in the downtown and "Strip" areas of Las Vegas.  Interstate 15 is a common route to use to get from the Strip area or south of the Strip (such as near Tropicana Ave. near the airport) to the downtown area, because Las Vegas Boulevard itself (the Strip) is crowded with pedestrian traffic and cross-streets.  I-15 is invariably heavily crowded such that it is not unusual to be followed very closely on this stretch of road.  I-15 is not only the major north-south thoroughfare through the Las Vegas metropolis for the city's residents, it is packed full of taxicabs transporting tourists between the airport and the Strip.  During the morning rush hour, the road is so crowded that traffic cannot maintain speed at or near the speed limit, and accidents are common because of the heavy traffic.  It was publicized in the newspapers that Senator Reid himself was involved in an accident on this very stretch of road just last year.  Petitioner provided no evidence of any direct communication of any threat.  The only evidence was of a perceived, implied threat via an unidentified officer in an unidentified vehicle following Juror 2's vehicle closely on a stretch of road where that is normal.  There is no evidence that the alleged "tail" happened between Henderson and I-15, where similar behavior would indeed seem odd, especially if it continued through multiple turns, but only after Petitioner was on I-15, where the close following was not odd.  After Juror 2 exited I-15, the car only followed him until he turned right onto Carson St. where the parking garage was. (*See id.* 136–37).  In other words, the car never followed Juror 2 through any turns, except for the exit from I-15 to the downtown area. The Court rejects this claim, as it cannot be said that the state court's ruling was clearly erroneous.

### 2. Count 2 - Ineffective Assistance of Trial Counsel

Petitioner first argues that trial counsel was ineffective for having an improper

understanding of DNA evidence. Most of the claim, however, is dedicated to attacking the State's conduct with respect to DNA evidence, which is not at issue before the Court. The claim in fact tends to indicate that trial counsel did everything reasonable with respect to DNA evidence. It is the State who is alleged to have engaged in misconduct with respect to defense counsel's requests for DNA testing and other trial tactics. The Court perceives no ineffective assistance of trial counsel with respect to DNA evidence or that it is reasonably probable that the trial court would have ordered a mistrial or an acquittal had counsel made the objections Petitioner argues he should have.

Petitioner next argues that trial counsel was ineffective for failing to object to other alleged instances of prosecutorial misconduct. The State's rebuttal argumentation to the jury in response to the defense's arguments that here had been some kind of conspiracy against Petitioner were not improper. Nor were the State's arguments attacking the credibility of defense theories. And again, the question before this Court in the context of the present Petition is not alleged prosecutorial misconduct but whether defense counsels' objections to the alleged misconduct would have been reasonably probable to have led to a mistrial or an acquittal. The Court finds that to be exceedingly unlikely.

Petitioner next argues that trial counsel was ineffective for failing to object to a jury instruction on reasonable doubt—the Nevada pattern instruction—that states in relevant part that reasonable doubt "is not mere possible doubt, but is such a doubt as would govern or control a person in the more weighty affairs of life." As Petitioner notes, however, the Court of Appeals has specifically held that this instruction comports with due process. *See Ramirez v. Hatcher*, 136 F.3d 1209, 1211–15 (9th Cir.), *cert. denied*, 525 U.S. 967 (1998). Trial counsel was not only not ineffective in failing to object to the instruction but would have been in violation of his duty of candor to the court to object to the instruction "to preserve it for later review."

Petitioner next argues that trial counsel was ineffective for failing to object to the State's

description of the reasonable doubt standard in closing arguments, i.e., his repeated argument that there is no reasonable doubt if the jury has an "abiding conviction" of guilt. The Court rejects this claim. This language appears in the instruction itself, and there is no reason to think that defense counsel's failure to object could have led the jury to think that the rest of the instruction could be ignored. The State cannot have been expected to have recited the entire 100-plus-word reasonable doubt instruction every time it wished to invoke the standard during its closing arguments.

Petitioner next argues that trial counsel was ineffective for failing to litigate the issues in Ground 1, *supra*. The Court rejects this claim based upon the record, because it is clear that the jury misconduct/tampering issue was litigated via the motion for new trial. (*See* Pet'r's Ex. 40).

### 3. Count 3 - Ineffective Assistance of Appellate Counsel

Petitioner first argues that appellate counsel was ineffective for failing to litigate the issues in Ground 1, *supra*, on direct appeal. The Court rejects this claim based upon the record, because it is clear that the jury misconduct/tampering issue was litigated to the Nevada Supreme Court on appeal. (*See* Pet'r's Ex. 56).

Petitioner next argues that appellate counsel was ineffective for failing to litigate the issues in Ground 2, *supra*, on direct appeal. The Court rejects this claim on its face, because ineffective assistance of trial counsel claims cannot be directly appealed in Nevada unless the trial court has held an evidentiary hearing or one would be needless. *See Archanian v. State*, 145 P.3d 1008, 1020–21 (Nev. 2006). In any case, the question of appellate counsel's ineffectiveness in failing to challenge the effectiveness of trial counsel is rendered moot by virtue of this Court's present consideration of trial counsel's ineffectiveness directly under Count 2 of the present Petition.

### 4. Ground 4 - Cumulative Error

The Court rejects this claim. The Court perceives no error.

# CONCLUSION

IT IS HEREBY ORDERED that the Petition is DISMISSED.

IT IS SO ORDERED.

Dated this 16th day of September, 2013.

_____
ROBERT C. JONES
United States District Judge